**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| ATMA BEAUTY, INC., individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | |
| HDI GLOBAL SPECIALTY SE, AXIS SPECIALTY EUROPE SE, UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NUMBER RSK003959, and UNDERWRITERS AT LLOYD'S LONDON KNOWN AS SYNDICATES AFB 2623, AFB 623, APL 1969, ARG 2121, BRT 2987, BRT 2988, HIS 33, KLN 510, MMX 2010, MSP 318, NVA 2007, TRV 5000, XLC 2003, | Civil Action No.: 1:20-cv-21745-DPG  Judge: Darrin P. Gayles |
| Defendants. | |

**DEFENDANTS CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. RSK003959'S MOTION TO DISMISS THE COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff in this putative class action, Atma Beauty, Inc. ("Plaintiff"), seeks insurance coverage for business interruption related to the COVID-19 pandemic from Defendants HDI Global Specialty SE, Underwriter's at Lloyd's London Subscribing to Policy Number RSK003959, and Underwriters at Lloyd's London known as Syndicates AFB 2623, AFB 623, APL 1969, ARG 2121, BRT 2987, BRT 2988, HIS 33, KLN 510, MMX 2010, MSP 318, NVA 2007, TRV 5000, and XLC 2003 ("Underwriters").

Plaintiff's Complaint must be dismissed for several reasons:

(1) The insurance policy at issue is a Commercial Property policy that insures Plaintiff's property against direct physical loss or damage. The policy does provide "Business

Income" coverage, but in order for that coverage to apply, consistent with the property coverage being provided, there must be direct physical loss of or damage to the insured property. Plaintiff's Complaint fails to sufficiently allege that fundamental predicate, nor could it ever do so under the alleged circumstances.

(2)  The policy also provides Business Income coverage if a civil authority prohibits access to insured property because of direct physical damage to nearby property. Again, Plaintiff fails to allege direct physical damage to nearby property or that access to the insured property has been prohibited by a civil authority because of such direct physical damage.

(3) Even if the policy's requirements discussed above had been met, coverage is excluded by the policy's microorganism exclusion, which excludes coverage for any claim arising directly or indirectly out of a microorganism. The novel Coronavirus, also known as SARS-CoV-2, is unquestionably a microorganism.

(4) Additionally, the policy contains pollution exclusions, which preclude coverage for any claim related to substances that pose a threat to human health. Here, Plaintiff's insurance claim arises out of SARS-CoV-2, which poses a threat to human health.

(5) The Complaint fails to sufficiently allege causes of action for breach of contract, as Plaintiff provides no supporting facts to support its claim.

Accordingly, Underwriters' Motion to Dismiss should be granted

## I.    FACTUAL BACKGROUND

### A.    THE POLICY

Plaintiff owns and operates a beauty salon and spa named "Atma Beauty" in Miami Beach, Florida. Underwriters subscribed to a policy that insures the property on which the beauty salon is located. Policy No. RSK003959, issued to Plaintiff, provides coverage for direct physical loss of

2

or damage to the property located at 1874 West Avenue, Miami Beach, Florida 33139[1] (the "Property") effective for the policy period of December 19, 2019, to December 19, 2020 (the "Policy"). (Exhibit A).[2]

The Policy's insuring clause provides:

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the Premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

(Policy, Exhibit A, Form CP 00 10 10 12, at p. 1 of 16).  "Covered Cause of Loss" is defined in the Policy as "risks of direct physical loss unless the loss is… excluded… or…limited." (Policy, Exhibit A, Form CP 10 30 06 07, at p. 1 of 10).

While the Policy does provide coverage for loss of "Business Income," the loss must also arise out of direct physical loss or damage to the insured property as identified in the "declarations" page of the Policy.  With respect to business income, the Policy's "Business Income" coverage states, in part:

**1. Business Income**

\* \* \*

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". ***The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations*** and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

(Policy, Exhibit A, Form CP 00 30 10 12, at p. 1 of 9) (emphasis added).

The Policy also provide coverage for "Extra Expense" which is defined, in part, as:

---

[1] The insured property is identified on the Schedule of Locations of the Policy.
[2] The Policy is attached to the Complaint and reattached here for the Court's convenience.

**2. Extra Expense**

    **a.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no ***direct physical loss or damage to property*** caused by or resulting from a Covered Cause of Loss.

(Policy, Exhibit A, Form CP 00 30 10 12, at p. 1 of 9) (emphasis added)). As noted above, "Business Income" and "Extra Expense" coverages are only provided during the "period of restoration" which is defined as:

… the period of time that:

a.  Begins:

    (1) 72 hours after the time of ***direct physical loss or damage*** for Business Income Coverage; or

    (2) Immediately after the time of ***direct physical loss or damage*** for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

b.  Ends on the earlier of:

    (1) The date when the property at the described premises should ***be repaired, rebuilt or replaced*** with reasonable speed and similar quality; or

    (2) The date when business is resumed at a new permanent location.

(Policy, Exhibit A, Form CP 00 30 10 12, at p. 9 of 9) (emphasis added). In other words, the Policy does not provide coverage for business income and extra expense if the loss is caused by something other than direct physical loss or damage resulting from a covered cause of loss. And coverage is only provided for that time needed to repair, rebuild, or replace the damaged property.

    The Policy provides "Civil Authority" coverage but, and again consistent with the fundamental principle of a property insurance policy, direct physical loss or damage to property is required as the civil authority action must result from damage to property caused by a Covered Cause of Loss:

    **a.  Civil Authority**

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a *Covered Cause of Loss causes damage to property other than property at the described premises*, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1) *Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage*, and the described premises are within that area but are not more than one mile from the damaged property; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(1) Four consecutive weeks after the date of that action; or

(2) When your Civil Authority Coverage for Business Income ends;

whichever is later.

(Policy, Exhibit A, Form CP 00 30 10 12, at p. 2 of 9) (emphasis added).

The Policy contains an endorsement that modifies the Civil Authority coverage. However, none of those modifications change the basic coverage requirements of direct physical loss or damage to nearby property and a prohibition on access to the insured property because of such damage. The Policy modifies the Civil Authority extension as follows:

The following applies to the Additional Coverage – Civil Authority under the Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form and Extra Expense Coverage Form:

1. The Additional Coverage – Civil Authority includes a requirement that the described premises are not more than one mile from the damaged property.

> With respect to described premises located in Florida, such one-mile radius does not apply.
>
> 2. The Additional Coverage – Civil Authority is limited to a coverage period of up to four weeks. With respect to described premises located in Florida, such four-week period is replaced by a three-week period.
>
> 3. Civil Authority coverage is subject to all other provisions of that Additional Coverage.

(Policy, Exhibit A, Form CP 01 25 07 08, at p. 2 of 2). Thus, among the requirements to trigger civil authority coverage, damage to property must prohibit access to the Property.

The Policy contains certain applicable exclusions. Among those exclusions are the microorganism exclusion (Policy, Exhibit A, Form LMA 5018), and broad pollution exclusions (Policy, Exhibit A, Form NMA 2340 and Form CP 10 30 06 07, at p. 4 of 10).

**B.     THE INSURANCE CLAIM**

On April 2, 2020, Plaintiff submitted a claim seeking recovery for business income loss as a result of local and state orders related to COVID-19 (the "Claim"). (Exhibit B, Notice of Loss). A short time later, before Underwriters could conduct any investigation into the Claim, Plaintiff filed this lawsuit. (Doc. 1). In the Complaint, Plaintiff alleges that

> The presence of COVID-19 caused direct physical loss of and/or damage to the covered premises…by…damaging the property, denying access to the property, preventing customers from physically occupying the property, causing the property to be physically uninhabitable by customers, causing its function to be nearly eliminated or destroyed, and/or causing suspension of business operations on the premises.

(Doc. 1 ¶ 46). The Complaint also alleges that "Plaintiff was forced to suspend business operations at the [Property], as a result of COVID-19" and that "[r]elated actions of civil authorities also prohibited access to and occupancy of the [Property]." (*Id*. at ¶ 8). Notably, however, the Complaint fails to provide any description of the "direct physical loss and damage", but instead gives an incomplete recitation of the various orders. All the referenced government measures were put in place to promote social distancing and slow the spread of COVID-19 by minimizing contact

6

between residents. These orders were not issued as a result of any "direct physical loss of or damage" to property, as required under the Policy to trigger coverage. Moreover, the orders did not "prohibit access" to the Property, as they only restricted public access to the Property, but did not restrict Plaintiff, nor its employees, from entering the premises.

## II.   LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Jacobs v. Tempur-Pedic Int'l., Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," but must allege more than "labels and conclusions," "formulaic recitation of the elements of a cause of action," or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts are not required to accept the labels and legal conclusions in the complaint as true. *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009).

To survive a motion to dismiss, a complaint must contain facts that, when assumed to be true, sufficiently "state a claim to relief that is *plausible on its face*." *Iqbal*, 556 U.S. at 678 (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal"). A complaint that does not "contain sufficient factual matter, accepted as true, to state a claim . . . plausible on its face" is subject to dismissal.

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012 | MIAMI, FL 33156 | T: 786-870-5600 | F: 855-802-5821

*Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (citing *Twombly*, 550 U.S. at 570).

Moreover, "when the allegations of the complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (citation and quotations omitted).

### III.   ARGUMENT

### A.   PLAINTIFF'S COMPLAINT FAILS TO ALLEGE DIRECT PHYSICAL LOSS OF OR DAMAGE TO PROPERTY COVERED BY THE POLICY

The Complaint contains no plausible allegations that the Property has suffered "direct physical loss or damage."  The Policy provides coverage for business income and extra expense losses only if such losses are the result of "direct physical loss of or damage to" the insured Property. (Policy, Exhibit A, Form CP 00 30 10 12, at p. 1 of 9). Further, business income and extra expense coverages are only provided during the "period of restoration", which is the time it takes to repair, rebuild or replace the Property.  (Policy, Exhibit A, Form CP 00 30 10 12, at p. 9 of 9). Here, there has been no direct physical loss or damage to the Property, as evidenced by the fact that there is nothing to repair, rebuild or replace at the Property.

 The plain language of the Policy "requires direct physical loss or damage to the properties in order to trigger payment" for a business income loss. *See Lubell & Rosen LLC v. Sentinel Ins. Co.*, Ltd., No. 0:16-CV-60429-WPD, 2016 WL 8739330, at *4 (S.D. Fla. June 10, 2016). Florida law places the initial burden on an insured seeking to recover under an all-risk policy of proving that a loss occurred.  *See S.O. Beach Corp. v. Great Am. Ins. Co. of New York*, 305 F. Supp. 3d 1359, 1364 (S.D. Fla. 2018), *aff'd*, 791 F. App'x 106 (11th Cir. 2019). An insured's pleading must sufficiently allege that its losses are covered within a policy's insuring agreement. *See Timber*

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012 | MIAMI, FL 33156 | T: 786-870-5600 | F: 855-802-5821

*Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1293 (M.D. Fla. 2016). "A complaint that does not 'contain sufficient factual matter, accepted as true, to state a claim . . . plausible on its face' is subject to dismissal." *Id.* at 1292 (quoting *Am. Dental Ass'n*, 605 F.3d at 1289).

Accordingly, to recover for business income loss, Plaintiff must plead and then prove that it sustained damage to property that is insured by its Policy, that the damage was caused by a covered cause of loss, and that there was an interruption to its business that was caused by the property damage. *Dictiomatic, Inc. v. U.S. Fid. & Guar. Co.*, 958 F. Supp. 594, 602 (S.D. Fla. 1997); *cf. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Texpak Grp. N.V.*, 906 So. 2d 300, 302 (Fla. 3d DCA 2005) (holding that business interruption and extra expense losses are covered "only if 'resulting from' damage or destruction of real or personal property caused by a covered peril."). In the Complaint, Plaintiff merely alleges that "COVID-19 caused direct physical loss of and damage to [the Property]." (Doc. 1 ¶¶ 77, 87, 97, and 107). Plaintiff also alleges that "[t]he presence of COVID-19 caused direct physical loss of and/or damage" to the Property "by, among other things, damaging the property, denying access to the property, preventing customers from physically occupying the property, causing the property to be physically uninhabitable by customers, causing its function to be nearly limited or destroyed, and/or causing the suspension of business operations on the premises." (Doc. 1 ¶ 46).

Under the federal rules, pleading the bare elements of a claim is insufficient—Plaintiff "must include some supporting facts." *N.P.V. Realty Corp. v. Nationwide Mut. Ins. Co.*, No. 8:11-CV-1121-T-17TBM, 2011 WL 4948542, at *4 (M.D. Fla. Oct. 17, 2011). Here, Plaintiff makes conclusory allegations that it has suffered direct physical damage, but the Complaint is devoid of any mention of what physical damage occurred, how the physical damage occurred, and when the physical damage occurred. Moreover, Plaintiff appears to assert that the presence of COVID-19

somehow inexplicably caused property damage by "denying access to the property" and "preventing customers from physically occupying the property." (Doc. 1 ¶ 46). None of Plaintiff's allegations, however, even if taken as true, state a plausible claim that Plaintiff has suffered a "direct physical loss or damage" as required to trigger coverage under the Policy. *See Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, No. 8:15-cv-1821-T-17TBM, 2016 WL 8943313, at *2 (M.D. Fla. Feb. 4, 2016) ("[I]t is not sufficient to plead that the Plaintiff has suffered damages in the form of 'direct physical damage to its property.'").

The phrase "direct physical loss or damage" "must be given its common meaning." *Rockhill Ins. Co. v. Northfield Ins. Co*., 297 F. Supp. 3d 1279, 1286 (M.D. Fla. 2017). This Court has concluded that "[a] direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.'" *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-cv-23362-KMM, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) (quoting *Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co*., 187 Cal. App. 4th 766, 779 (2010)). If the property can be cleaned and restored to its original function, no covered loss has been suffered. *Id.* ("cleaning is not considered direct physical loss"). The relevant inquiry is whether the structure continues to function. Indeed, "[t]he fact that the restaurant needed to be cleaned more frequently does not mean [the plaintiff] suffered a direct physical loss or damage." *Id.* Furthermore, as stated by the oft-cited Couch on Insurance, and as explicitly adopted by this Court:

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

*Id.* (quoting 10A Couch on Ins. § 148:46 (3d. Ed. West 1998)); *see also Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) ("In ordinary parlance and widely accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration' of its structure.").

In the context of a lawsuit seeking injunctive relief against an insurer for business income coverage related to COVID-19, one court already found that the disease, and the virus that causes it, do not cause physical loss or damage.  Teleconference, Order to Show Cause at 4-5*, Soc. Life Magazine, Inc. v. Sentinel Ins. Co. Ltd.,* No. 20-CV-3311-VEC (S.D.N.Y. May 14, 2020) (Transcript with oral findings attached hereto as Exhibit C). With regard to COVID-19, the Court in *Soc. Life Magazine* noted: "It damages lungs.  It doesn't damage printing presses."  (*Id.* at 4:25-5:4). Additionally, another court recently granted summary disposition in favor of an insurer, finding there was no coverage for the plaintiff's COVID-19 related business income loss, since there was no direct physical loss of or damage. *See* Hearing, Motion for Summary Disposition, *Gavrilides Mgmt. Co. v. Mich. Ins. Co.*, No. 20-000258-CB (Mich. Cir. Ct. July 1, 2020) ("Plaintiff just can't avoid the requirement that there has to be something that physically alters the integrity of the property. There has to be some tangible, i.e. physical damage to the property."). (Transcript with oral findings attached hereto as Exhibit D).[3]

Moreover, the Policy only provides coverage for business income and extra expense losses incurred during the "period of restoration" which begins with the "direct physical loss or damage" and ends on the earlier of "(1) The date when the property at the described premises should be repaired, rebuilt or replaced . . . or (2) The date when business is resumed at a new permanent

---

[3] Plaintiff attempts to argue that the presence of COVID-19 somehow caused "direct physical loss of and/or damage" to the Property, by "causing the property to be physically uninhabitable" and "causing its function to be nearly eliminated or destroyed. Such creative interpretations fail as this Court, in *Mama Jo's*, rejected the notion that loss of use equates to physical damage.  *Mama Jo's*, 2018 WL 3412974, at *9.

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012| MIAMI, FL 33156| T: 786-870-5600 | F: 855-802-5821

location." (Policy, Exhibit A, Form CP 00 30 10 12, at p. 9 of 9). Thus, it follows that for there to be coverage under the Policy's business income or extra expense coverage, Plaintiff's loss must involve some physical damage to covered property that needs to be repaired, rebuilt, or replaced. As explained by the Southern District of New York, "the words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it." *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co*., 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) (citations omitted); *see also Phila. Parking Auth. v. Fed. Ins. Co*., 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005) ("'Rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature.").

Any other reading of the Policy to allow recovery for Plaintiff's Claim would render central contract terms superfluous. Under Florida law, "insurance contracts are construed according to their plain meaning." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). Further, "courts must not construe insurance policy provisions in isolation, but instead should read all terms in light of the policy as a whole, with every provision given its full meaning and operative effect." *Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 734 F. Supp. 2d 1304, 1314 (S.D. Fla. 2010) (citations omitted). Courts may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998).

Thus, under the plain language of the Policy, coverage is only afforded for business income and extra expense losses if those losses are caused by direct physical loss or damage. Here, Plaintiff's Claim is solely economic in nature and does not relate to any sort of physical damage, and, therefore, is not covered under the Policy. *See Bahama Bay II Condo. Ass'n, Inc v. United Nat'l Ins. Co*., 374 F. Supp. 3d 1274, 1278 (M.D. Fla. 2019) ("cost of security guards and security

fencing . . . is not property damage, or 'physical loss . . .' but is an economic loss. There is nothing in the Policy that covers economic loss."); *see also* Exhibit C, Order to Show Cause at 15 ("[T]his kind of business interruption needs some damage to the property . . . this is just not what's covered under these insurance policies.").

Accordingly, Plaintiff's Complaint does not allege any facts that trigger coverage under the Policy and its claims fail as a matter of law.

### B.    PLAINTIFF HAS NOT PLED A VALID CIVIL AUTHORITY CLAIM

As the basis for its civil authority claim, Plaintiff points to governmental orders issued by the State of Florida, Miami-Dade County, and the City of Miami Beach throughout the months of March and April 2020. (Doc. 1 ¶¶ 39-45). On March 1, 2020, Florida Governor Ron DeSantis issued Executive Order 20-51 directing the State Health Officer and Surgeon General to declare a public health emergency. (Exhibit E, Florida Executive Order 20-51).[4] Then, on March 9, 2020, Governor DeSantis issued Executive Order 20-52, declaring a state of emergency. (Exhibit F, Florida Executive Order 20-52). On March 12, 2020, the City of Miami Beach also declared a State of Emergency. (Doc. 1 ¶ 41; Exhibit G, City of Miami Beach Declaration of State of Emergency).

The City of Miami Beach then issued an emergency order on March 16, 2020, requiring non-essential business to limit their hours of operation and occupancy. (Exhibit H, City of Miami Beach Emergency Order March 16, 2020). On March 18, 2020, the City of Miami Beach issued another emergency order, requiring message therapy centers and spas to be "closed to the public." (Exhibit I, City of Miami Beach Emergency Order March 18, 2020). On March 19, 2020, Miami-

---

[4] These government orders are a matter of public record. When ruling on a motion to dismiss, a district court may consider evidence if its authenticity is a matter of public record. *See Myers v. Foremost Ins. Co.*, No. 8:15-CV-1363-MSS-JSS, 2015 WL 12830477, at *3 (M.D. Fla. Oct. 23, 2015) (citing *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010)).

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012 | MIAMI, FL 33156 | T: 786-870-5600 | F: 855-802-5821

Dade County issued Emergency Order 07-20, requiring the closure of all non-essential businesses. (Doc Exhibit J, Miami-Dade Emergency Order 07-20). Beauty salons were not deemed essential businesses. (*See id.*).

On March 30, 2020, Governor DeSantis issued Executive Order 20-89, requiring Miami-Dade, Broward, Palm Beach, and Monroe Counites to "restrict public access" to non-essential businesses pursuant to the guidelines established by Miami-Dade County Emergency Order 07-20. (Doc. 1 ¶ 44; Exhibit K Florida Executive Order 20-89). On April 23, the City of Miami Beach extended the State of Emergency declaration. (Doc. 1 ¶ 41; Exhibit L, City of Miami Beach Declaration of State of Emergency Extended). Plaintiff alleges that the City of Miami Beach extended the State of Emergency, allegedly in part because of "the propensity of COVID-19 to 'caus[e] property loss and damage in certain circumstances.'" (Doc. 1 ¶ 41). However, the Emergency Order does not state it was issued in response to any property damage, but was issued to "take immediate action to control and reduce threats associated with the COVID-19 [sic], to protect the public health, safety and welfare of the people of the City of Miami Beach." (Exhibit L). In fact, none of the above-referenced orders were issued as a result of any "direct physical loss of or damage" to property, nor did the orders "prohibit access" to the Property for Plaintiff or its employees.

Plaintiff's allegations fail to trigger the Policy's civil authority coverage. In Florida, the "policyholder bears the initial burden of proving that a loss occurred under the insuring agreement during the policy period." *Somethings Fishy Enter., Inc. v. Atl. Cas. Ins. Co.*, 415 F. Supp. 3d 1137, 1142 (S.D. Fla. 2019). The civil authority coverage requires physical loss or damage to property near the insured property, and further requires that access to the insured property is prohibited

because of that damage.[5]  Plaintiff's effort to obtain civil authority coverage fails because (1) it alleges no such physical loss or damage, and (2) access to the Property has never been prohibited.

In the Complaint, Plaintiff alleges that "the presence of COVID-19 caused direct physical loss of and/or damage to covered premises under the Policy." (Doc. 1, ¶ 46). Plaintiff argues that the orders of Mayor Gimenez, Governor DeSantis, and the City of Miami Beach trigger the "Civil Authority" coverage under its Policy. (*See* Doc. 1, ¶ 118). As noted above, the civil authority coverage requires that a "Covered Cause of Loss causes damage to property other than property at the described premises." A "Covered Cause of Loss" is defined as "risk of direct physical loss." Accordingly, the first requirement of the civil authority coverage is that there be direct physical loss that causes damage to property other than the insured property.  Next, because of that damage to nearby property, a civil authority must prohibit access to the insured property. The action of the civil authority must also be "taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage." (Policy, Exhibit A, Form CP 00 30 10 12, at p. 2 of 9). In other words, because of direct physical loss that causes damage to other property, the civil authority must prohibit access to the insured location because the nearby property damage has created a dangerous condition. Plaintiff fails to sufficiently allege these necessary elements.

The plain language of the Policy makes clear that the civil authority coverage requires damage to property other than the described premises *and* an order of civil authority prohibiting access to the insured's property because of such damage. *See, e.g.*, *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686-87 (5th Cir. 2011) ("Civil authority coverage is intended to

---

[5] Plaintiff may contend that the Policy's language does not require the damaged property to be near the insured premises. Even if this were true, Plaintiff's civil authority claim fails because it does not allege direct physical loss or damage to *any* property, near or far.

apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises in the proximity of the insured's property."). As explained above, COVID-19 does not cause physical damage or loss to property, and therefore, Plaintiff cannot satisfy the conditions of the civil authority coverage extension. Even looking beyond that shortcoming, there are two more reasons why Plaintiff cannot fulfill the conditions of the civil authority coverage extension: (1) access to the Property has not been "prohibited;" and (2) the subject government orders were not taken "in response" to damaged property.

While the subject government orders prohibited Plaintiff from allowing customers into the Property for business purposes, no government order prevented Plaintiff itself, or its employees, from entering the Property. Although Florida courts do not appear to have considered the issue, numerous other courts have recognized that government orders that hamper access to insured property—but do not entirely *prohibit* it— are insufficient to trigger civil authority coverage. *See, e.g.*, *S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1140 (10th Cir. 2004) (upholding denial of hotel operators' claim for lost business income sustained when customers cancelled visits due to order grounding of flights after the 9/11 attacks); *Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, No. 06-770-C, 2007 WL 2489711, at *1 (M.D. La. Aug. 29, 2007) (holding that civil authority provision was not triggered by Louisiana government order prior to Hurricane Katrina advising residents to stay off the streets because advisories did not "prohibit access" to the insured premises); *By Dev. Inc. v. United Fire & Cas. Co.*, No. Civ. 04-5116, 2006 WL 694991, at *6 (D.S.D. Mar. 14, 2006) (finding that road closures after wildfire did not prohibit access to insured's business); *54th Street Partners v. Fid. & Guar. Ins. Co.*, 305 A.2d 67, 67 (N.Y. Super. Ct. App. Div. 2003) (holding that civil authority

extension did not apply to insured who made lost business income claim due to city government's diversion of vehicular and pedestrian traffic in the proximity of its restaurant, because access to the restaurant was not denied). Since the civil authority extension requires Plaintiff to demonstrate that access to its Property was "prohibited" by civil authority, and Plaintiff did not make any such allegations (nor indeed could it), the civil authority extension does not apply.

Second, the subject government orders were not issued "in response" to dangerous physical conditions resulting from physical property damage to nearby property. Rather the orders were issued as precautionary measures to prevent the further spread of COVID-19. In such situations, the civil authority extension is not triggered. *See Syufy Enter. v. Home Ins. Co. of Ind.*, No. 94-0756 FMS, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995). As detailed in *Syufy*, after the return of the Rodney King verdict and subsequent riots, the cities of Los Angeles, San Francisco, and Las Vegas imposed dawn-to-dusk curfews. *Id.* at *1. An insured movie theater operator, who ran theaters in all three cities, submitted a business interruption claim because it closed its theaters during these curfew periods. *Id.* The court concluded there was no civil authority coverage because not only did the civil orders not specifically prohibit individuals from entering the theaters, but the "requisite causal link between damage to adjacent property and denial of access to a Syufy theater [was] absent." *Id.* at *2. In other words, Syufy had closed its theaters as a "direct result of the city-wide curfews," not as a result of adjacent property damage. Furthermore, the court noted that even though the curfews were imposed to "prevent" property damage, they were not the result of the damage itself. *Id.* at *2. Other courts have reached similar conclusions. *See United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 353 (S.D.N.Y. 2005) (holding civil authority coverage did not apply to airport's business interruption claim arising from grounding of flights after the 9/11 attacks because the order to ground flights and bar access to the airport was "to

prevent further attacks and as a matter of national security," not because of damage to the Pentagon); *City of Chi. v. Factory Mut. Ins. Co.*, No. 02-C-7023, 2004 WL 549447, at *4 (N.D. Ill. Mar. 18, 2004) ("The business interruption . . . was due to the ground stop order imposed by the FAA in order to prevent further terrorist attacks."); *cf. Prime Alliance Grp., Ltd. v. Hartford Fire Ins. Co.*, No. 06-22535-CIV-UNGARO, 2007 WL 9703576, at *4 (S.D. Fla. Oct. 19, 2007) ("[A] plain language reading of this section provides coverage when a peril—such as a windstorm—causes damage to property and, as a result, access to property is precluded by a civil authority order. The order of civil authority cannot in any reasonable manner be construed as a 'peril.'").

Plaintiff cannot establish that physical damage occurred due to COVID-19, nor can it establish that the government orders prohibited access to the Property. Moreover, these government orders were not taken in response to covered physical damage but were instead preventative measures issued for public health purposes. Accordingly, the Policy's civil authority coverage extension is not triggered.

## C.   COVERAGE IS BARRED BY THE MICROORGANISM EXCLUSION

The Complaint must be dismissed because Plaintiff's Claim is excluded from coverage by the plain language of the Policy. When resolving insurance coverage disputes, courts "routinely dismiss complaints for failure to state a claim when a review of the insurance policy and the underlying claim for which coverage is sought unambiguously reveals that the underlying claim is not covered." *Cammarota v. Penn-Am. Ins. Co.*, No. 17-CV-21605-Williams, 2017 WL 5956881, at *2 (S.D. Fla. Nov. 13, 2017); *see also Arias-Bonello v. Progressive Select Ins. Co.*, No. 0:17-CV-60897-UU, 2017 WL 7792704, at *5 (S.D. Fla. Aug. 8, 2017) (dismissing putative class member's breach of contract claims because the claims were expressly excluded from the policy);

*MJCM, Inc. v. Hartford Cas. Ins. Co.*, No. 8:09-CV-2275-T-17TBM, 2010 WL 1949585, at \*7 (M.D. Fla. May 14, 2010) (granting motion to dismiss under Rule 12(b)(6) because underlying lawsuit was not covered under the subject insurance policy).  Here, even if Plaintiff could demonstrate a claim within the Policy's coverage grant (which it cannot), coverage nonetheless is barred by the Microorganism Exclusion.

> The Microorganism Exclusion provides:
>
> This policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to:
>
>> mold, mildew, fungus, spores or other micro-organisms of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.
>
> This exclusion applies regardless whether there is (i) any physical loss or damage to insured property; (ii) any insured peril or cause, whether or not contributing concurrently or in any sequence; (iii) any loss of use, occupancy, or functionality; or (iv) any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.
>
> This exclusion replaces and supersedes any provision in the policy that provides insurance, in whole or in part for these matters.

(Policy, Exhibit A and B, Form LMA 5018). As set forth below, SARS-CoV-2, which causes COVID-19 is a microorganism. Therefore, the plain language of this exclusion bars Plaintiff's Claim, which directly or indirectly arises from SARS-CoV-2.

Florida law requires that the Microorganism Exclusion be applied as written. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) ("[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision"). Stated differently, when interpreting unambiguous policy terms, "there is no special construction or interpretation required, and the plain language of the policy will be given the meaning it clearly expresses." *Phila Indem. Ins. Co. v. Yachtsman's Inn Condo Ass'n, Inc.*, 595 F. Supp. 2d 1319, 1323 (S.D. Fla. 2009).

The only two jurisdictions to have substantively addressed similar microorganism exclusions, with one being a Florida circuit court, both found the exclusion to be valid and enforceable. *See Certain Underwriters at Lloyd's of London Subscribing to Policy No. SMP 3791 v. Creagh*, 563 F. App'x 209, 211 (3d Cir. 2014) (holding that the district court correctly applied the microorganism exclusion to the plaintiff's claim); *Certain Underwriters at Lloyd's, London Subscribing to Policy No. W15F03160301 v. Houligan's Pub & Club, Inc.*, No. 2017-31808-CICI, 2019 WL 5611557, at *11 (Fla. Cir. Ct. Oct. 24, 2019) (concluding that "the Microorganism Exclusion bars coverage for the claims in this case"). In *Creagh*, the insured's claim arose after a tenant of its building died and the decomposition of the tenant's body damaged his apartment unit. *Creagh*, 563 F. App'x at 209. The United States District Court for the Eastern District of Pennsylvania held that the subject microorganism exclusion applied because the fluids that escaped the tenant's body and contaminated the unit contained bacteria, which are microorganisms. *See Certain Underwriters at Lloyd's London v. Creagh*, No. 12-571, 2013 WL 3213345, at *3 (E.D. Pa. June 26, 2013). The Third Circuit upheld the decision on appeal. *Creagh*, 563 F. App'x at 211.

A Florida circuit court similarly recognized the unambiguous nature and enforceability of microorganism exclusions in the *Houligan's* case. In *Houligan's*, an insured suffered damage when its building was flooded with sewage and waste following a hurricane. *Houligan's*, 2019 WL 5611557, at *1. In applying the microorganism exclusion to the plaintiff's claim, the *Houligan's* court stated:

> For better or worse, the parties bargained for an insurance policy that contains an extremely broad Microorganism Exclusion, one which supersedes and replaces any language in the Policy that might otherwise provide coverage for the loss in question. As noted, the exclusion applies even in the presence of an insured peril or cause that contributes concurrently to the insureds' loss. This Court must apply the Policy in a manner consistent with its plain language. Doing so leads the Court

to conclude that the Microorganism Exclusion bars coverage for the claims in this case.

*Id.* at *11. Significantly, the *Houligan's* court looked to the Center for Disease Control's website and dictionary definitions to find that E. Coli and enterococcus, both of which were present in the sewage and waster, are bacteria, and thus, microorganisms that cause an actual or potential threat to human health. *Id.* The decision in *Houligan's* provides a legal roadmap for this Court because SARS-CoV-2 is a microorganism that causes an actual or potential threat to human health, and any claim arising out of SARS-CoV-2, regardless of whether physical damage occurred or whether there is some other contributing or concurrent cause, is therefore excluded from coverage.

Secondary sources, like those relied upon by the *Houligan's* court, support a determination that SARS-CoV-2 is a microorganism. No less than the foremost U.S. governmental authorities in the fight against COVID-19—the U.S. Department of Health and Human Services, National Institutes of Health and National Institute of Allergy and Infectious Diseases—defined microorganism as "microscopic organisms, including bacteria, viruses, fungi, plants, and animals."[6] This is consistent with the findings of other governmental agencies.[7] Adding additional support, scientific journals and textbooks also state that viruses are microorganisms.[8] Even non-scientific sources such as Encyclopedia Britannica, for instance, lists the following "major groups of microorganism": bacteria, archaea, fungi, algae, protozoa, and viruses.[9]

---

[6] *Understanding Microbes in Sickness and in Health*, U.S. DEP'T OF HEALTH & HUMAN SERVS., NAT'L INST. OF HEALTH 47 (Jan. 2006) (Attached hereto as Exhibit M).
[7] *What is a Microorganism?* NAT'L PARK SERV., U.S. DEP'T OF INTERIOR, 2 (April 2014), https://www.nps.gov/common/uploads/teachers/lessonplans/What%20is%20a%20Microorganism%20Activity%20Guide2.pdf (listing viruses as one of the five categories of microorganisms).
[8] *See, e.g.*, Wendy Keenleyside, MICROBIOLOGY: CANADIAN EDITION, § 1.3 (June 23, 2019) ("Viruses are acellular microorganisms."); Kathryn Nixdorff, et al., *Critical Aspects of Biotechnology in Relation to Proliferation*, 150 NATO SCI. SERIES II: MATHEMATICS PHYSICS & CHEMISTRY, 33, 33 (2004) ("Viruses are microorganisms.").
[9] *See Types of Microorganisms*, ENCYCLOPEDIA BRITANNICA (last visited May 6, 2020), https://www.britannica.com/science/microbiology/Types-of-microorganisms.

As a result, the Microorganism Exclusion unambiguously excludes coverage for the Plaintiff's Claim.

### D.     COVERAGE IS BARRED BY THE POLLUTION EXCLUSIONS

In addition to the Microorganism Exclusion, the Policy contains two enforceable exclusions barring coverage for contaminants and contamination. First, the Policy contains the Seepage and/or Pollution and/or Contamination Exclusion, which provides:

> SEEPAGE AND/OR POLLUTION AND/OR CONTAMINATION EXCLUSION USA & CANADA
>
> Notwithstanding any provisions to the contrary within the Policy of which this Endorsement forms part (or within any other Endorsement which forms part of this Policy, this Policy does not insure:
>
> (a) any loss, damage, cost or expense, or
>
> (b) any increase in insured loss, damage, cost or expense, or
>
> (c) any loss, damage, cost, expense, fine or penalty, which is incurred, sustained or imposed by order, direction, instructions or request of, or by agreement with, any court, government agency or any public, civil or military authority, or threat thereof, (and whether or not as a result of public or private litigation.)
>
> which arises from any kind of seepage or any kind of pollution and/or contamination, or threat thereof, whether or not caused by or resulting from a Peril Insured, or from steps or measures taken in connection with the avoidance, prevention, abatement, mitigation, remediation, clean-up or removal of such seepage or pollution and/or contamination or threat thereof.
>
> * * *
>
> The term 'any kind of seepage or any kind of pollution and/or contamination' as used in this Endorsement includes (but not limited to):
>
> (a) seepage of, or pollution and/or contamination by, anything, including but not limited to, any material designated as 'hazardous material' by the United States Environmental Protection Agency or as 'hazardous material' by the United States Department of Transportation, or defined as a 'toxic substance' by the Canadian Environmental Protection Act for the purposes of Part II of that Act, or any substance designated or defined as toxic, dangerous, hazardous or deleterious to persons or the environment under any Federal, State, Provincial, Municipal or other law, ordinance or regulation; and
>
> (b) the presence, existence, or release of anything which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

(Policy, Exhibit A, Form NMA 2340).[10] The Policy also contains the following exclusion, which states:

> 2.  We will not pay for loss or damage caused by or resulting from any of the following:
>
> * * *
>
> l.  Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss."

(Policy, Exhibit A, Form CP 10 30 06 07, at p. 4 of 10). The term "pollutant" is defined, in part, as "any solid, liquid gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Policy, Exhibit A, Form CP 00 10 10 12, at p. 16 of 16). Under the plain language of either of these exclusions (collectively, the "Pollution Exclusions"), and Florida law, coverage for the Claim is excluded.

The Florida Supreme Court has recognized that pollution exclusions extend beyond merely "environmental or industrial pollution." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998) (holding that a claim arising from an ammonia spill fell within a pollution exclusion). Instead, the plain language of pollution exclusions should be enforced as written and Florida courts should not "place limitations upon the plain language of a policy exclusion simply because [they] may think it should have been written that way." *Id.* at 1139. This includes the term "contaminant," which the Florida Supreme Court held to be unambiguous. *See id.*

SARS-CoV-2 undoubtedly qualifies as a "pollutant" and/or "contamination." The Southern District of Florida has recognized that "living organisms," "microbial populations," "microbial

---

[10]  Notably, the "pollutant/contamination" exclusion applies "[n]otwithstanding any provision to the contrary" and it does not replace or supersede any similar provisions.

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012 | MIAMI, FL 33156 | T: 786-870-5600 | F: 855-802-5821

contaminants," and "indoor allergens" fit the ordinary definition of a "contaminant." *Nova Cas. Co. v. Waserstein*, 424 F. Supp. 2d 1325, 1334 (S.D. Fla. 2006). In *Nova*, this Court reasoned that these substances "infected the plaintiffs' bodies or made them impure by contact, thereby fitting the ordinary meaning of a 'contaminant,' and having an effect commonly known as 'contamination.'" *Id.* Relatedly, this Court has enforced a pollution exclusion to exclude coverage for a claim arising from "viral contaminants" and "harmful microbe[s]" found in an insured's swimming pool, from which a guest alleged that he contracted the Coxsackie virus. *See First Specialty Ins. Corp. v. GRS Mgmt. Assocs., Inc.*, No. 08-81356-CIV, 2009 WL 2524613, at *4-5 (S.D. Fla. Aug. 17, 2009); *see also James River Ins. Co. v. Epic Hotel, LLC*, No. 11-CV-24292-UU, 2013 WL 12085984, at *4 (S.D. Fla. Jan. 9, 2013) (applying pollution exclusion to bar coverage for claims arising from Legionnaire bacteria). Other courts have reached analogous conclusions. *See, e.g.*, *U.S. Fire Ins. Co. v. City of Warren*, 87 F. App'x 485, 487, 490 (6th Cir. 2003) (applying a pollution exclusion to sewage water that was alleged to contain "pathogens, carcinogens, and disease carrying organisms including but not limited to HIV viruses, *e. coli* bacteria, hepatitis (all strains), and other bacteria"); *Certain Underwriters at Lloyd's London v. B3, Inc.*, 262 P.3d 397, 400-401 (Okla. Ct. App. 2011) (holding a pollution exclusion applied to claim stemming from contaminated water alleged to contain, among other things, "bacteria (including E. Coli) [and] viruses").

The Policy's definitions of "contamination" and "pollutant" unambiguously encompass SARS-CoV-2. Just as this Court reasoned in *Nova*, SARS-CoV-2 is a virus that infects peoples' bodies, thereby fitting the ordinary meaning of "contaminant." *Nova Cas. Co.* 424 F. Supp. 2d at 1334.[11] Similarly, under pollution exclusions like the Policy's "pollution exclusion," claims

---

[11] To be sure, COVID-19 is a disease caused by the virus SARS-CoV-2. Alexander E. Gorbalenya et al., *The species Severe acute respiratory syndrome-related coronavirus: classifying 2019-nCoV and naming it SARS-CoV-2*, 6

24

stemming from viruses are precluded from coverage under such exclusions, as demonstrated by this Court's decision in *First Specialty Ins. Corp.  See* 2009 WL 2524613, at *4-5. SARS-CoV-2 has been "designated or defined" as "dangerous" by both Federal and State ordinances or regulations. Indeed, the U.S. Department of Health and Human Services has determined that the "SARS coronavirus" (SARS-CoV), to which COVID-19 is related,[12] is a "biological agent . . . and toxin" with "the potential to pose a severe threat to public health and safety." 42 C.F.R. § 73.3(a) & (b) (2017). Moreover, in the subject executive orders issued by Governor DeSantis, the Governor stated that he is "responsible for meeting the *dangers* presented to this state and its people by [COVID-19]." (Exhibit F (emphasis added)); *see also* Exhibit K). Thus, SARS-CoV-2 has been defined as dangerous to human health by both the federal government and government of Florida.

Having established that SARS-CoV-2 qualifies as a pollutant and/or contaminant under the Policy and Florida law, the Pollution Exclusions clearly apply, given that they exclude coverage for claims "arising from" or "resulting from" pollution and/or contamination. (Policy, Exhibit A, Form NMA 2340; Form CP 10 30 06 07, at p. 4 of 10). Causation phrases such as these are broadly construed in Florida. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532

---

NATURE MICROBIOLOGY 526, 526 (March 2, 2020). Continuing, this Court has repeatedly considered at the motion to dismiss stage secondary sources such as scholarly articles. *See Jones v. Santander Consumer USA Inc.*, No. 16-14012-CIV-ROSENBERG/LYNCH, 2016 WL 11570406, at *3 (S.D. Fla. Aug. 2, 2016) (listing secondary sources that conflict with argument in motion to dismiss); *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1371 n. 1 (S.D. Fla. 2015) (incorporating numerous secondary sources cited in Rule 12(b)(6) motion to dismiss); *cf. Aldar Tobacco Grp., LLC v. Am. Cigarette Company, Inc.*, No. 08-62018-CIV-JORDAN, 2010 WL 11601994, at *1 (S.D. Fla. Dec. 29, 2010) (admonishing attorney for citing "zero cases, statutes, codes, or *secondary sources* in his motion to dismiss") (emphasis added). Ultimately, this Court has "complete discretion" to accept material beyond the pleadings when considering a motion to dismiss. *Continental Cas. Co. v. Hardin*, No. 8:16-cv-322-17GW, 2016 WL 11234458, at *11 (M.D. Fla. Dec. 5, 2016).

[12]  *See COVID-19, MERS & SARS*, NAT'L INST. OF ALLERGY & INFECTIOUS DISEASES (April 6, 2020), https://www.niaid.nih.gov/diseases-conditions/covid-19; Alping Wu, et al., *Genome Composition & Divergence of the Novel Coronavirus (2019-nCov) Originating in China*, Commentary, 27 Cell Host & Microbe 325, 326 (Mar. 11, 2020) ("[T]he 2019-nCov is in the same *Betacoronavirus* clade as MERS-CoV, SARS-like bat CoV, and SARS-CoV.").

25

(Fla. 2005) (holding that causation phrase "arising out of" is broader than "caused by" as used in an exclusion). Moreover, Plaintiff asserts that its Claim was the result of "COVID-19[13] caus[ing] direct physical loss of and damage to [Plaintiff] and other Class members' insured premises, resulting in suspension[] of business operations at these premises." (Doc. 1, ¶ 77). Accordingly, the Claim as alleged arose from or resulted from SARS-CoV-2 and is excluded from coverage under the Policy.

### E.   COUNTS II, IV, AND VI FAIL TO ALLEGE UNDERWRITERS HAVE BREACHED THE POLICY

Plaintiff has not stated valid claims for breach of contract. To sufficiently plead a claim for breach of contract under Florida law, a plaintiff "must assert the existence of a contract, a breach of such contract, and damages resulting from such breach." *Cruz v. Underwriters at Lloyd's London*, No. 8:14-CV-1539-T-33TBM, 2014 WL 3809179, at \*2 (M.D. Fla. Aug. 1, 2014). While Plaintiff's 131-paragraph Complaint sets forth an expansive background facts section, it fails to allege specific facts supporting its claims of breach in Counts II, IV, and VI.

Plaintiff alleges that "[b]y denying coverage" Underwriters "are in breach of the Policy" and conclusory alleges that its alleged losses trigger the Policy's business income, civil authority, and extra expense coverages. (Doc. 1 ¶¶ 90, 110, 130). However, Plaintiff fails to include necessary factual information to support these claims. These allegations are wholly conclusory and must, therefore, be dismissed. *See Whitney Nat. Bank v. SDC Communities, Inc.*, No. 809CV01788EAKTBM, 2010 WL 1270264, at \*3 (M.D. Fla. Apr. 1, 2010) (dismissing claims for breach of contract because plaintiff failed to allege sufficient factual information to support its claims*); Davidson v. Georgia*, 622 F.2d 895, 897 (11th Cir. 1980) ("When the allegations

---

[13] As discussed above, COVID-19 is the disease caused by SARS-CoV-2. The virus, SARS-CoV-2, does not cause direct physical loss of or damage to property for the reasons discussed above, and the disease that it causes of course does not also cause such damage.

contained in a complaint are wholly conclusory ... and fail to set forth facts which, if proved, would warrant the relief sought, it is proper to dismiss for failure to state a claim."); *see also Timber Pines Plaza*, 2016 WL 8943313, at *2 ("To be clear, it is not sufficient under *Iqbal* to merely plead that the Defendant breached the Policy by failing to pay the benefits owed under the Policy.").

Moreover, even if Plaintiff's allegations are considered true, Underwriters have not breached the Policy because there is no coverage for Plaintiff's Claim. Accordingly, Plaintiff has failed to sufficiently plead that coverage is provided by the Policy, as the express language of the Policy expressly contradicts Plaintiff's allegations that its losses are covered under the Policy. *See Cruz,* 2014 WL 3809179, at *4 (finding that plaintiff failed to sufficiently plead that its loss was covered under a policy, since the express language of an exclusion contradicted plaintiff's allegations that its claim was covered).

Accordingly Counts II, IV and VI for breach of contract must be dismissed.

### IV.    CONCLUSION

Plaintiff has failed to satisfy its burden to plead facts that would give rise to a covered claim. Additionally, Plaintiff cannot allege facts that sufficiently demonstrate it has suffered a direct physical loss of or damage to its Property. Even if Plaintiff could allege a covered cause of loss, its claims are unambiguously excluded under the Policy. Because Plaintiff cannot plead a covered cause of loss under the Policy, it cannot assert its breach of contract actions.

Thus, for the foregoing reasons, Underwriters respectfully request the Court dismiss Plaintiffs' Complaint.

FIELDS HOWELL LLP
Attorneys for Defendants, Underwriters
9155 So. Dadeland Blvd.
Suite 1012
Miami, FL 33156
Tel:  (786) 870-5600

Fax: (855) 802-5821

By:*/s/ Armando P. Rubio*
    Armando P. Rubio, Esq.
    Florida Bar No. 478539
    arubio@fieldshowell.com
    service@fieldshowell.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Motion to Dismiss was served via CM/ECF on July 14, 2020 upon all parties.

*/s/ Armando P. Rubio*
By: Armando P. Rubio

Attorneys for Defendants

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012| MIAMI, FL 33156| T: 786-870-5600 | F: 855-802-5821