## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:20-cv-21745-DPG

ATMA BEAUTY, INC., individually and
on behalf of all others similarly situated,

       Plaintiff,

v.                                                                                            **CLASS ACTION**

HDI GLOBAL SPECIALTY SE, AXIS
SPECIALTY EUROPE SE, UNDERWRITERS
AT LLOYD'S LONDON SUBSCRIBING TO
POLICY NUMBER RSK003959, and
UNDERWRITERS AT LLOYD'S LONDON
KNOWN AS SYNDICATES AFB 2623,
AFB 623, APL 1969, ARG 2121, BRT 2987,
BRT 2988, HIS 33, KLN 510, MMX 2010,
MSP 318, NVA 2007, TRV 5000, XLC 2003,                          **JURY TRIAL DEMANDED**

       Defendants.
_____/

### AMENDED CLASS ACTION COMPLAINT

Plaintiff Atma Beauty, Inc., individually and on behalf of all others similarly situated, files

this class action against HDI Global Specialty SE, Axis Specialty Europe SE, Underwriters at

Lloyd's London Subscribing to Policy Number RSK003959 and Underwriters at Lloyd's London

known as Syndicates AFB 2623, AFB 623, APL 1969, ARG 2121, BRT 2987, BRT 2988, HIS

33, KLN 510, MMX 2010, MSP 318, NVA 2007, TRV 5000, and XLC 2003, and in support states

the following:

### INTRODUCTION

1.     Plaintiff Atma Beauty, Inc. is the owner and operator of Atma Beauty, a full-service

salon and medical spa located at 1874 West Avenue in Miami Beach, Florida.

2.      To protect the salon and the income from operation of the salon, Plaintiff purchased a property insurance policy with policy number RSK003959 (the "Policy").

3.      The Policy was issued and underwritten by Defendants HDI Global Specialty SE, Axis Specialty Europe SE, Underwriters at Lloyd's London Subscribing to Policy Number RSK003959 and Underwriters at Lloyd's London known as Syndicates AFB 2623, AFB 623, APL 1969, ARG 2121, BRT 2987, BRT 2988, HIS 33, KLN 510, MMX 2010, MSP 318, NVA 2007, TRV 5000, and XLC 2003.

4.      The Policy is a bilateral contract: Plaintiff agreed to pay monthly premiums to Defendants, in exchange for Defendants' promises of coverage for certain losses.

5.      Among other types of coverage, the Policy protects Plaintiff against a loss of business income due to a slowdown or cessation of the salon's operations.  This type of coverage is often referred to as business interruption coverage.

6.      The Policy also provides "Extra Expense" coverage, under which Defendants promised to pay expenses that Atma Beauty incurred to minimize the suspension of business. Additionally, the Policy provides "Civil Authority" coverage, under which Defendants promised to pay for loss of business income caused by the action of a civil authority prohibiting access to the salon.

7.      Plaintiff duly complied with its obligations under the Policy and paid the requisite premiums.

8.      The SARS CoV-2 virus, sometimes referred to as the novel coronavirus, has infected people and contaminated property across the country, including in South Florida. As of January 19, 2021, Miami-Dade County has had at least 346,089 coronavirus infections. In other

words, 12.7% of Miami-Dade's population has been infected with coronavirus.[1] And because at least some infected residents have not been tested for the virus, the true number of infections is likely even higher.

9.      The virus has a proclivity to accumulate on, contaminate, and alter the condition of property.  It can spread and linger in the air, it can accumulate in ventilation systems, and it can attach to surfaces where it can remain infectious for several days.  Moreover, given the widespread nature of coronavirus infection and contamination, even temporary solutions like cleaning and disinfection cannot eliminate the high risk of recontamination.

10.     Accordingly, there is nothing that businesses like restaurants and hair salons can practically do—other than shutting down entirely—to permanently and reliably eliminate contamination by the coronavirus.  According to experts, "there can be a high risk of COVID-19 infection in hair and nail salons, spas and barbershops even with safety precautions implemented at those establishments given the close proximity between clients and employees especially for longer lengths of time."[2]

11.     As a result, and even in the absence of government-mandated closures or restrictions on access, commercial establishments have been forced to close their businesses, severely limit and change their operations, and reconfigure their premises.  Businesses have made these necessary alterations to their properties in order to mitigate, prevent, and contain the contamination and re-contamination of individuals, air, and surfaces in and on their property.

---

[1]     Florida Coronavirus Map and Case Count, N.Y. TIMES, available at https://www.nytimes.com/interactive/2020/us/florida-coronavirus-cases.html (last visited 1/19/2021); COVID-19 United States Cases by County, Johns Hopkins University of Medicine Coronavirus Resource Center, available at https://coronavirus.jhu.edu/us-map (last visited Jan. 19, 2021).

[2]     *Is It Safe to Get A Hair Cut or Your Nails Done Right Now?,* UNC Health Talk (Nov. 10 2020), https://healthtalk.unchealthcare.org/is-it-safe-to-get-a-hair-cut-or-your-nails-done-right-now/ (last visited Jan. 19, 2021) (citing opinion of Emily Sickbert-Bennett, PhD, MS).

12.     The combination of coronavirus contamination and these necessary physical restrictions and alterations have altered the character of businesses' properties, and seriously impaired businesses' ability to use their properties. Therefore, over the past ten months, businesses nationwide, including in Miami-Dade, have suffered not only physical loss of and damage to their property, but also an accompanying loss of business income.

13.     Beginning in March 2020, Plaintiff was forced to close the Atma Beauty salon as a result of the presence of COVID-19 and related government orders. After the closure orders were lifted, Atma Beauty re-opened. But it re-opened in a physically transformed, altered and impaired state. Not only was the salon subject to the continuous and constant risk of recontamination, but the salon also made significant necessary physical alterations to its property to minimize, contain and mitigate coronavirus contamination.

14.     These alterations, which include but are not limited to drastic reductions in the number of active beauty stations, have severely impaired Atma's ability to make use of its property. As a result, business at the Atma Beauty salon has slowed. In short, Atma Beauty has suffered a suspension of business operations, as those terms are defined and understood in the Policy. This suspension, which is ongoing, has caused Plaintiff to suffer significant losses and incur significant expenses.

15.     Under the Policy, Defendants promised to cover these losses and expenses, and are obligated to pay for them. But in blatant breach of their contractual obligations, Defendants have failed to pay for these losses and expenses.

16.     Upon information and belief, Defendants have failed to pay for similar losses and expenses suffered and incurred by at least thousands of other insureds holding policies that are, in all material respects, identical.

4

## THE PARTIES

17.     Plaintiff Atma Beauty, Inc. is a Florida corporation organized to do business and doing business at 1874 West Avenue, Miami Beach, Florida 33139.

18.     Defendant HDI Global Specialty SE ("HDI Global") is a European society company organized under the laws of Germany, with its principal place of business in Germany. HDI Global is a wholly owned subsidiary of Talanx AG, a publicly traded company organized under the laws of Germany, with its principal place of business in Germany.  At all times material, HDI Global engaged in continuous and not isolated activity in the United States and specifically in Florida, including but not limited to contracting to insure property located in Florida.

19.     Defendant Axis Specialty Europe SE ("Axis Specialty") is a European society company organized under the laws of Ireland, with its principal place of business in Ireland.  Axis Specialty is a wholly owned subsidiary of Axis Capital Holdings Limited, a publicly traded company organized under the laws of Bermuda, with its principal place of business in Bermuda. At all times material, Axis Specialty, Axis Capital Holdings Limited, and other affiliated companies engaged in continuous and not isolated activity in the United States and specifically in Florida, including but not limited to contracting to insure property located in Florida.  At all times material, Axis Capital Holdings Limited maintained several U.S. offices, including an office located at 1111 Brickell Avenue, Suite 1820, in Miami, Florida.

20.     Defendants Underwriters at Lloyd's London known as Syndicates AFB 2623, AFB 623, APL 1969, ARG 2121, BRT 2987, BRT 2988, HIS 33, KLN 510, MMX 2010, MSP 318, NVA 2007, TRV 5000, and XLC 2003, and Underwriters at Lloyd's London Subscribing to Policy Number RSK003959 (collectively, the "Lloyd's Defendants") are insurance underwriters that participate in the insurance market known as Lloyd's of London.  At Lloyd's of London, insurance

underwriters form syndicates to jointly price and underwrite risk.  These syndicates enter into insurance contracts on behalf of their members, and the members share the premiums, risk, and liability on these contracts.  Each Lloyd's syndicate is identified by its syndicate number.

21.     The Lloyd's Defendants are insurance underwriters who contracted—by and through the syndicates of which they are members—to insure the Atma Beauty salon.  As indicated in Atma Beauty's Policy, the underwriters of the Policy include the members of the Lloyd's syndicates identified by the numbers AFB 2623, AFB 623, APL 1969, ARG 2121, BRT 2987, BRT 2988, HIS 33, KLN 510, MMX 2010, MSP 318, NVA 2007, TRV 5000, and XLC 2003.

22.     At all times material, Defendants engaged in substantial and not isolated activity on a continuous and systematic basis in the state of Florida, namely by issuing and selling insurance policies in Florida and by contracting to insure property located in Florida.

23.     Under the applicable law and in accordance with the Policy's Service of Suit Clause, service of process on Defendants may be effectuated by serving Mendes & Mount, at 750 Seventh Avenue, New York, New York, 10019.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is diversity between Defendants and at least one member of each class; there are more than one hundred members of each class; and the amount in controversy exceeds $5,000,000 exclusive of interest and costs.  This Court also has subject matter jurisdiction under 28 U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims occurred within the

Southern District of Florida, and a substantial part of property that is subject of the action is situated in this district.

26.     This Court has personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193(1)(a) because Plaintiff's claims arise out of, among other things, Defendants conducting, engaging in, and/or carrying on business in Florida; Defendants breaching a contract in this state by failing to perform acts required by contract to be performed in this state; and Defendants contracting to insure property in Florida, including but not limited to the premises insured under the Policy. Defendants also purposefully availed themselves of the opportunity of conducting activities in the state of Florida by marketing their insurance policies and services within the state, and intentionally developing relationships with brokers, agents, and customers within the state to insure property within the state, all of which resulted in the policy at issue in this action.

## FACTUAL BACKGROUND

### *The Policy*

27.     In December 2019, Plaintiff obtained the Policy, a property insurance policy issued and underwritten by Defendants. The Policy has a policy period of December 19, 2019 to December 19, 2020. The insured property under the Policy is 1874 West Avenue, in Miami Beach, Florida, the location of the Atma Beauty salon.[3]

28.     The Policy is an "all-risk" insurance policy. This type of policy differs from a "perils" policy, which only insures for loss of or damage to property from perils specifically enumerated and identified in the policy. In contrast to a perils policy, an all-risk policy provides coverage for losses—including business income losses—incurred as a result of *any and all* perils which are not expressly and specifically excluded.

---

[3]     The Policy is attached to this complaint as Exhibit "A."

29.     Plaintiff's all-risk policy is based on the standard all-risk policy issued by Defendants and contains no exclusion that would allow Defendants to deny coverage for losses caused by the coronavirus and related government orders.

30.     Consistent with the all-risk nature of the Policy, Defendants specifically agreed to pay for all losses caused by "Covered Causes of Loss," defined as "Risks Of Direct Physical Loss" unless the loss is excluded under the Policy.

31.     One type of coverage provided by the Policy is for loss of business income, often called business interruption insurance.  This coverage is specifically provided for in a section of the Policy titled "Business Income (and Extra Expense) Coverage Form."

32.     Pursuant to this Form, Defendants promised to pay for "Loss of Business Income" caused by a Covered Cause of Loss.  Specifically, Defendants promised to pay for the loss of Business Income sustained due to the necessary "suspension" of the insured's "operations" during the "period of restoration."

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".

33.     Each of the operative terms of this coverage provision is defined as follows.

34.     Business Income means the net profit that the business would have earned absent the suspension of operations, plus any continuing normal operating expenses, including payroll.

> Business Income means the:
> a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
> b. Continuing normal operating expenses incurred, including payroll.

35.     Suspension means, among other things, a slowdown or cessation of the insured's business activities.

> 6. "Suspension" means:
>    a. The slowdown or cessation of your business activities; or
>    b. That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

36.     Period of Restoration means the period of time beginning 72 hours after physical loss or damage to the property and ending on the date when the property is repaired or the date when business is resumed at a new location, whichever is earlier.

> 3. "Period of restoration" means the period of time that:
>    a. Begins:
>       (1) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or
>       (2) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;
>       caused by or resulting from any Covered Cause of Loss at the described premises; and
>    b. Ends on the earlier of:
>       (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or
>       (2) The date when business is resumed at a new permanent location.

37.     Additionally, under the Policy, Defendants also promised to cover "Extended Business Income." This coverage requires Defendants to pay for loss of business income *beyond* the Period of Restoration under certain conditions.

38.     Specifically, Defendants promised to pay for the actual loss of Business Income during the period that begins on the date that the insured property is repaired, and ends either 60 days thereafter or on the date when operations are restored to the level which would generate business income at normal levels, whichever is earlier.

39.     In addition to promising to pay for loss of Business Income, under the Policy, Defendants also promised to pay for certain necessary "Extra Expense[s]."  Extra Expenses mean expenses that the policyholder incurs to, for example, minimize the suspension of business.

40.     The Policy also provides "Civil Authority" coverage.  Under this type of coverage, Defendants promised to pay for the loss of Business Income and Extra Expense that the Plaintiff sustained as a result of "action of civil authority that prohibits access to the described premises [Atma Beauty]."

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

41.     This Civil Authority provision is an independent basis for business interruption coverage.  That is, it can be triggered even when the standard business interruption coverage is not.

42.     In short, Defendants agreed and promised in the Policy to pay for certain financial losses and expenses suffered and incurred by Plaintiff, so long as those losses result from a risk of direct physical loss of or damage to Plaintiff's property.

43.     Parts of the Policy, including the "Business Income (and Extra Expense) Coverage Form," are standardized forms drafted by the Insurance Services Office (ISO).  The ISO is a company that drafts standard policy language for use in insurance contracts.

44.     In 2006, the ISO drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses resulting from the presence of disease-causing agents.  Endorsement CP 01 40 07 06, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

45.     As the ISO explained in filings with state insurance regulators, the impetus for the Endorsement was to exclude risks related to a pandemic caused by transmission of a virus.  The ISO provided similar explanations of the Endorsement's scope and effects on coverage in a circular accompanying the Endorsement.

46.     As reflected in the ISO's own publications and filings, the ISO knew and understood that without a *specific* virus exclusion, all-risk insurance policies would provide coverage for losses due to viral pandemics.  Moreover, the ISO shared this understanding with regulators as well as with insurance companies that use ISO forms.

47.     Significantly, although other insurers have since included Endorsement CP 01 40 07 06 in their policies, Defendants chose to not include this endorsement in Plaintiff's Policy.

48.     Not only does Plaintiff's Policy not contain the ISO virus exclusion Endorsement. It also does not contain any other exclusion which would apply to allow Defendants to deny coverage for losses caused by COVID-19 and related actions of civil authorities taken in response to COVID-19.

49.     Accordingly, because the Policy is an all-risk policy and does not specifically exclude the losses that Plaintiff has suffered, those losses are covered.

***The coronavirus and its impact on property***

50.     The coronavirus has spread quickly throughout the United States and much of the world, and it remains widespread throughout the country.  The United States has had over twenty-four million coronavirus infections, and presently averages over two hundred thousand new confirmed infections per day.

51.     Anyone infected with the coronavirus, including those not showing symptoms and those who have not been tested, may unknowingly spread the virus to others by expelling tiny respiratory droplets when speaking, coughing, or sneezing.  These droplets can then attach to surfaces or linger and travel in the air.  The CDC has estimated that approximately 40% of people infected with the coronavirus are asymptomatic and have unknowingly left the virus in places they have visited. The CDC reports that these people have contributed to the virus's spread, and that the rate of infection is much higher than reported.[4]

52.     The persistently high number of infections nationally and locally underscores several basic facts about the coronavirus: it is physically pervasive; it exists in humans, in the air, on surfaces and on objects; it remains highly contagious in air and on surfaces for hours and up to several days; and there is no readily available mechanism to permanently or reliably eliminate coronavirus contamination in occupied spaces.

---

[4]     *See* Erika Edwards, *CDC says COVID-19 cases in U.S. may be 10 times higher than reported*, NBC News (June 25,2020) (https://www.nbcnews.com/health/health-news/cdc-says-covid-19-cases-u-s-may-be-10-n1232134); Ellen Cranley, *40% of people infected with COVID-19 are asymptomatic, a new CDC estimate says*, Business Insider (Jul 12, 2020) (https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7).

53.     According to scientific research, the two main mechanisms for coronavirus contamination of people and property are airborne contamination and contamination through surfaces.  When a person infected with the coronavirus expels particles and droplets containing the virus, the virus can then be directly inhaled by others, linger in the air and risk inhalation at a later point in time, or land on and attach to surfaces where it can come into contact with others who touch those surfaces.

54.     The coronavirus is active and transmissible in airborne particles of various sizes, from larger respiratory droplets to microscopic "aerosols."  Respiratory droplets can travel short and medium distances.  Smaller coronavirus-carrying aerosols can float through the air and accumulate over time.[5]  These tiny viral particles can linger in the air for hours, invading heating and air ventilation systems where they remain in circulation for longer periods of time.[6]  Experts thus have suggested that business property owners upgrade HVAC systems to limit the circulation of viral particles that may exist within the system.[7]

55.     Coronavirus-carrying aerosols are most likely to accumulate in confined indoor spaces, including retail locations like restaurants and beauty salons.

56.     In addition to airborne and aerosol-based contamination, the coronavirus also contaminates surfaces by attaching to them.  The virus can remain active on surfaces for up to

---

[5]      *See* Dyani Lewis, *Mounting evidence suggests coronavirus is airborne—but health advice has not caught up*, NATURE (July 8, 2020), *available at* https://www.nature.com/articles/d41586-020-02058-1#:~:text=Converging%20lines%20of%20evidence%20indicate,air%20and%20accumulate%20over%20time.

[6]      Neeltje van Doremalen, *et al.*, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N. ENGL. J. MED. (Mar. 17, 2020), available at https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

[7]      Zeynep Tufeckci, *We Need to Talk About Ventilation*, THE ATLANTIC, July 30, 2020, available at https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-aboutairbornetransmission/614737/.

several days or even weeks.[8]  As with aerosol contamination, the contamination of surfaces is also most likely in confined indoor spaces.  Objects and surfaces that are contaminated with the coronavirus are sometimes referred to as "fomites."[9]

57.    As reported by *The New England Journal of Medicine*, the coronavirus remains detectable in the air for up to three hours, on copper for up to four hours, on carboard for up to twenty-four hours, and on plastic and stainless steel for up to three days.[10] Other scientific sources report that the coronavirus may remain on polystyrene plastic, aluminum and glass for as long as eight days, and can remain infectious on surfaces and objects at normal room temperatures for up to nine days.[11]

58.    Like many businesses, Plaintiff's property contains various surfaces and equipment made of plastic, glass, and other materials on which the virus can remain active for long periods of time.  Plaintiff also uses glass, plastic and metal equipment as part of its business of providing beauty services.  Plaintiff's property therefore became an incubator for the coronavirus, as a business whose very nature requires frequent customer traffic and close physical engagement between customers and staff.

---

[8]    *See Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, Vol. 104, Kemp., G., et al., Journal of Hospital Infection, No. 3, March 2020, pages 246-251 (remains infectious from 2 hours to 28 days depending on conditions); see also https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-and-why-one-test-may-not-be-enough (doorknobs and table tops can contain the virus); https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal, glass and plastic for several days).

[9]    *See, e.g.*, Boris Pastorino et al., *Prolonged Infectivity of SARS-CoV-2 in Fomites*, CDC Research Letter (Sept. 2020), *available at* https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article.

[10]    Neeltje van Doremalen, *et al.*, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N. Engl. J. Med. (Mar. 17, 2020), available at https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

[11]    Boris Pastorino, *et al.*, *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 Emerging Infectious Diseases 9 (Sept. 2020) (https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article).

59.     At present, there are no known mechanisms for completely or permanently eliminating coronavirus contamination in occupied indoor spaces.  Cleaning and disinfecting are, at best, temporary and short-lived solutions.  So long as a property is occupied, there is a constant risk of recontamination of air and surfaces.

60.     With respect to surface contamination and fomites, indoor spaces are likely continuously re-contaminated so long as they remain occupied.  Accordingly, the application of liquid cleaning agents to surfaces is only a temporary and partial solution.  With respect to aerosols, the only known mechanisms for mitigating the accumulation of coronavirus-carrying aerosols in indoor spaces are to increase ventilation or install expensive equipment for filtering air.  And even these solutions do not completely eliminate the risk of coronavirus contamination.

61.     In short, permanently and reliably eliminating coronavirus contamination of property is presently impossible for occupied indoor spaces.  Plaintiff's only options are and have been (a) to contain and mitigate the contamination through physical alterations that necessarily lead to a slowdown in business; or (b) to shut down entirely.  The alternative—to continue its business unabated and without physical alterations—would not only risk the safety of Plaintiff's staff, Plaintiff's customers, and the general public, but it would also expose the property to a near-certain risk of widespread and unmitigated physical contamination by the coronavirus.

62.     The coronavirus, its omnipresence in Miami-Dade County, and the constant risk of widespread contamination and recontamination have altered Atma Beauty's property from a once satisfactory state to a current unsatisfactory and highly dangerous state for providing beauty services.  The coronavirus physically changed the condition of Plaintiff's property from usable and inhabitable to unusable, uninhabitable, unfit for its intended purpose of beauty services, and dangerous and unsafe for human occupation due to the ability of the coronavirus to physically

attach to and survive on surfaces within the property; travel through the ventilation system; accumulate in the air; and make contact with people, including employees and patrons, who are on the premises.

63.     The physical alteration of Plaintiff's insured property from a satisfactory state to an unsatisfactory and physically harmful state has forced and will continue to force Plaintiff and other businesses to make substantial physical changes to their properties.  These changes include but are not limited to the reconfiguration of seating, the installation of plexiglass shields and additional sanitizer dispensers, the enhancement of air filtration systems in response to the threat of transmission of the coronavirus from those coming in and out of the property, and the more frequent replacement of equipment due to the increased rate of deterioration from increased cleaning.  To the extent that Defendants' policies may arguably be interpreted to require a structural alteration to Plaintiff's property in order to trigger coverage—an interpretation that would be inconsistent with the law of Florida and other states—such alteration has indeed occurred.

64.     The insurance industry itself has also acknowledged that viruses physically alter insured property.  In 2006, the ISO not only explained that a specific virus exclusion was necessary to exclude pandemic-related risks from all-risk policies.  It also explained that "[d]isease-causing agents may render a product impure or enable the spread of disease *by the presence on the interior building surfaces or surfaces of personal property*." [12]

65.     Although a clear physical alteration has occurred, Plaintiff's Policy does *not* require structural alteration.  Defendants' standard all-risk policies cover "direct physical loss of **_or_**

---

[12]     Insurance Services Office, Inc., Circular, LI-CF-2006-175, July 6, 2006.

damage to" property.  By using the disjunctive "or," Plaintiff's Policy and other similar policies make clear that a "loss of" the insured property is *not* synonymous with "damage to" the property. Construing direct physical loss of to mean the same as physical damage to property would render the word "damage" superfluous.  Moreover, reading the Policy as a whole, the Policy clearly contemplates that "physical loss of or damage to" property includes *more than* structural damage.

### *Plaintiff's covered losses*

66.     Like many areas of the country, Miami-Dade County, where the Atma Beauty salon is located, suffers from widespread coronavirus contamination and infection.[13]  As a result, the coronavirus has undoubtedly been physically present on Plaintiff's property, before and after the danger of contracting the coronavirus became known to the public.  Equally important, the omnipresence of the virus, and the constant risk of contamination and re-contamination by the virus, have made it impossible for Plaintiff to continue normal operations at the salon.  Absent severe and drastic physical alterations to the Atma Beauty property, it would be impossible to reliably avoid or eliminate the presence of the virus on the property.

67.     The presence of COVID-19, including its presence in the vicinity of the Atma Beauty Salon, has prompted civil authorities throughout the United States ("Civil Authority Actions"), including but not limited to civil authorities with jurisdiction over Atma Beauty: the City of Miami Beach, Miami-Dade County, and the state of Florida.  These Civil Authority Actions have restricted and prohibited access to the insured property.

68.     On March 12, 2020, the City of Miami Beach declared a State of Emergency in response to COVID-19.  On April 23, the City extended the State of Emergency declaration

---

[13]     *See* COVID-19 United States Cases by County, Johns Hopkins University of Medicine Coronavirus Resource Center, available at  https://coronavirus.jhu.edu/us-map (last visited 1/15/2021).

through April 30, citing, among other things, the propensity of COVID-19 to "caus[e] property loss and damage in certain circumstances."

69.     Throughout March and April 2020, the City of Miami Beach issued and extended several Emergency Orders that ordered all City residents to remain home with certain exceptions, and closed all non-essential retail and commercial establishments, including but not limited to beauty salons.

70.     On March 19, 2020, Miami-Dade County issued Emergency Order 07-20, requiring the closure of all non-essential businesses, including but not limited to beauty salons.

71.     On March 30, 2020, the Governor of Florida signed Executive Order 20-89, ordering Miami-Dade County, among other counties, "to restrict public access" to non-essential businesses.

72.     In Florida, violations of an executive order issued by the Governor pursuant to the State Emergency Management Act are second-degree misdemeanors punishable by imprisonment.

73.     The presence of COVID-19 caused direct physical loss of and/or damage to the covered premises under the Policy in several respects:

    a.  First, the novel coronavirus physically contaminated the air in and surfaces
        on Plaintiff's property, thereby eliminating, impairing, or limiting the use
        of that property.  Although Plaintiff has undertaken diligent efforts—at
        Plaintiff's own significant expense—to mitigate, prevent, contain and
        reduce this contamination, Plaintiff has been unable to permanently or
        reliably end the contamination, because of the constant threat of
        recontamination of surfaces on and air in Plaintiff's property.  In short, the
        actual and imminent contamination and recontamination of Plaintiff's

       property have physically transformed and altered the property from a satisfactory to an unsatisfactory and unsafe state.

b.  Second, the actual and imminent physical contamination of Plaintiff's property forced Plaintiff to make necessary loss-mitigating physical alterations to its property. These alterations have including but are not limited to installing physical barriers throughout its property, using harsher cleaning agents that have led to faster deterioration of surfaces on its property, significantly reducing the occupancy of its property, and reducing the number of stations at which beauty services are provided.

c.  Third, the actual and imminent physical contamination of Plaintiff's property caused all or part of the property to be physically uninhabitable by customers at various periods between March of 2020 and the date of filing of this Amended Complaint.

d.  Fourth, the actual and imminent physical contamination of Plaintiff's property caused the property's physical function to be nearly eliminated, destroyed, and/or severely limited.

74.    At all times material to this action, demand for Atma Beauty's services has remained healthy. Therefore, to the extent that Atma Beauty has lost business income and suffered a slowdown in business since March 2020, it is because of the above-described physical loss of and damage to its property.

75.    In other words, Plaintiff has lost business income *not* because of a downturn in demand of a deterioration in market conditions, but because of the coronavirus, its actual and imminent physical contamination of the property, and necessary physical alterations to contain and

mitigate this contamination.  In short, Atma Beauty's losses are tethered to the direct physical loss of and damage to its property.

76.     Although some of the contamination of the property can be partly mitigated by decontamination protocols, this has not eliminated or fully mitigated Plaintiff's covered losses for several reasons.

    a.  First, given the constant threat of recurring and repeated contamination, cleaning protocols alone are insufficient to completely, reliably, and permanently eliminate the contamination.

    b.  Second and relatedly, Plaintiff has been forced to make necessary physical alterations to its property—in addition to decontamination protocols—that have caused a loss of business income.  For example, in an effort to contain and mitigate contamination by the coronavirus, Plaintiff has physically reconfigured its property and reduced the number of stations at which it provides beauty services.

    c.  Third, Plaintiff's cleaning protocols have themselves led to property loss and damage, as the use of harsher cleaning agents necessary to temporarily decontaminate surfaces exposed to the coronavirus have led those surfaces to deteriorate more rapidly.

77.     Therefore, although Plaintiff has sought to mitigate its business income losses, it has been unable to avoid or eliminate the suspension of business operations at its premises. Plaintiff is and has been unable to permanently or reliably eliminate or avoid coronavirus contamination of its property so long as it continues to operate its business at all.  The constant

risk of recontamination is particularly acute because Plaintiff's business is a beauty salon which requires employees to make close contact with their clients.

78.     The Civil Authority Actions prohibiting public access to the covered premises and the surrounding area were issued in response to dangerous physical conditions in the vicinity of the Atma Beauty salon and caused a suspension of business operations on the covered premises.

79.     As a result of the coronavirus, Atma Beauty has suffered a suspension of business operations, sustained losses of business income, and incurred extra expenses.

80.     As a result of the Civil Authority Actions, Atma Beauty has suffered a suspension of business operations, sustained losses of business income, and incurred extra expenses.

81.     These losses and expenses have continued through the date of filing of this action. Indeed, as of the date of filing, the salon continues to operate with limited occupancy and extensive necessary physical alterations.

82.     These losses and expenses are not excluded from coverage under the Policy.  And because the Policy is an all-risk policy, and Plaintiff has complied with its contractual obligations, Plaintiff is entitled to payment for these losses and expenses.

83.     Accordingly, Plaintiff provided notice of its losses and expenses to Defendants, consistent with the terms and procedures of the Policy.

84.     But contrary to the plain language of the Policy, and to Defendants' corresponding promises and contractual obligations, Defendants have refused to pay for Plaintiff's losses and expenses.

## CLASS ACTION ALLEGATIONS

85.     The class claims all derive directly from a single course of conduct by Defendants: their systematic and uniform refusal to pay insureds for losses suffered due to coronavirus contamination and the related actions taken by civil authorities to suspend business operations.

86.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and/or 23(b)(3), as well as 23(c)(4), of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

87.     Plaintiff seeks to represent nationwide classes defined as:

a)     All persons and entities with Business Income coverage under a property insurance policy issued by any of the Defendants, which suffered a suspension of business due to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge, accept as a covered loss, or pay for the covered losses  ("the Business Income Coverage Class").

b)     All persons and entities with Civil Authority coverage under a property insurance policy issued by any of the Defendants, which suffered loss of Business Income and/or Extra Expense caused by an action of a civil authority, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge, accept as a covered loss, or pay for the covered losses ("the Civil Authority Coverage Class").

c)     All persons and entities with Extra Expense coverage under a property insurance policy issued by any of the Defendants, which sought to avoid or minimize the suspension of business caused by COVID-19 and/or the actions of civil authorities in response to COVID-19, and for which Defendants have denied a claim for the expenses or

have otherwise failed to acknowledge, accept as a covered expense, or pay for the covered expenses ("the Extra Expense Coverage Class").

88.     Excluded from each defined proposed Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; Class Counsel and their employees; and the judicial officers and Court staff assigned to this case and their immediate family members.

89.     Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed Classes, as appropriate, during the course of this litigation.

90.     This action has been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

**Numerosity and Ascertainability**

91.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  The members of each proposed Class are so numerous that individual joinder of all Class members is impracticable. There are, at a minimum, thousands of members of each proposed Class, and these individuals and entities are spread out across the country.

92.     The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Defendants' or their agents' books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Predominance of Common Issues**

93.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law and fact which predominate over any questions affecting only individual Class members.  Defendants issued all-risk policies to all the members of each proposed Class in exchange for payment of premiums by the Class members.

The questions of law and fact affecting all Class members include, without limitation, the following:

a)      Whether Plaintiff and the Class members suffered a covered loss under the common policies issued to members of the Class;

b)      Whether Defendants wrongfully denied all claims based on COVID-19;

c)      Whether Defendants' Business Income coverage applies to a suspension of business caused by COVID-19 and/or related actions of civil authorities taken in response to the presence or threat of COVID-19;

d)      Whether Defendants' Civil Authority coverage applies to a loss of Business Income caused by the orders of local, municipal, city, county, and/or state governmental entities limiting or prohibiting access to businesses as a result of dangerous physical conditions caused by the coronavirus;

e)      Whether Defendants' Extra Expense coverage applies to efforts to avoid or minimize a loss caused by COVID-19 and the coronavirus;

f)      Whether Defendants have breached their contracts of insurance through a uniform and blanket denial of all claims for business losses related to COVID-19 and the coronavirus and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 and the coronavirus;

g)      Whether Plaintiff and the Class members suffered damages as a result of Defendants' actions; and

h)      Whether Plaintiff and the Class members are entitled to an award of reasonable attorneys' fees, interest, and costs.

**Typicality**

94.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class members and arise from the same course of conduct by Defendants.  Plaintiff and the other Class members are all similarly affected by Defendants' refusal to pay under their property insurance policies.  Plaintiff's claims are based upon the same legal theories as those of the other Class members.  Plaintiff and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendants engaged.  The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

95.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiff will fairly and adequately represent and protect the interests of Class members.  Plaintiff has retained counsel with substantial experience in prosecuting complex class action litigation.

96.     Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the Class members and have the financial resources to do so.  Neither Plaintiff nor its counsel has interests adverse to those of the Class members.

**Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests**

97.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1).  Plaintiff seeks class-wide adjudication as to the interpretation and scope of Defendants' property insurance policies.  The prosecution of separate actions by individual members of the proposed Classes would create an imminent risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

**Final Injunctive and/or Corresponding Declaratory Relief with respect to the Class is Appropriate**

98.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to the Class members.  The class claims all derive directly from Defendants' systematic and uniform refusal to pay insureds for losses suffered due to the COVID-19 pandemic, the coronavirus and the related actions taken by civil authorities to suspend business operations. Defendants' actions or refusal to act are grounded upon the same generally applicable legal theories.

**<u>Superiority</u>**

99.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The common questions of law and of fact regarding Defendants' conduct and the interpretation of the common language in their property insurance policies predominate over any questions affecting only individual Class members.

100.    Because the damages suffered by certain individual Class members may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for all individual Class members to redress the wrongs done to each of them individually, such that many Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

101.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation.  Compared

to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

102.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.   The Court may, on motion of Plaintiff or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

## CAUSES OF ACTION

### COUNT I: DECLARATORY JUDGMENT
**(On behalf of the Business Income Coverage Class)**

103.    Plaintiff re-adopts and re-alleges paragraphs 1 through 102 above.

104.    Plaintiff brings this Count individually and on behalf of the other members of the Business Income Coverage Class.

105.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

106.    Plaintiff's Policy, as well as the policies of other Business Income Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

107.    In the Policy, Defendants promised to pay for losses of business income sustained as a result of perils not excluded under the Policy.  Specifically, Defendants promised to pay for losses of business income sustained as a result of a suspension of business operations during the Period of Restoration.

108.    The coronavirus caused direct physical loss of and damage to Atma Beauty and other Class members' insured premises, resulting in suspensions of business operations at these premises.  These suspensions have caused Plaintiff and Class members to suffer losses of business income.

109.    These suspensions and losses triggered business income coverage under the Policy and other Class members' policies.

110.    Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

111.    Defendants, without justification, dispute that the Policy and other Class members' policies provide coverage for these losses.

112.    Plaintiff seeks a Declaratory Judgment that its Policy and other Class members' policies provide coverage for the losses of business income.

113.    An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Defendants' obligations to reimburse Plaintiff and other Class members for the full amount of these losses. Accordingly, the Declaratory Judgment sought is justiciable.

WHEREFORE, Plaintiff requests that this Court enter a Declaratory Judgment declaring that the Policy and other Class members' policies provide coverage for Class members' losses of business income.

## COUNT II: BREACH OF CONTRACT
### (On behalf of the Business Income Coverage Class)

28

114.     Plaintiff re-adopts and re-alleges paragraphs 1 through 102 above.

115.     Plaintiff brings this Count individually and on behalf of the other members of the Business Income Coverage Class.

116.     Plaintiff's Policy, as well as the policies of other Business Income Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

117.     In the Policy, Defendants promised to pay for losses of business income sustained as a result of perils not excluded under the Policy.  Specifically, Defendants promised to pay for losses of business income sustained as a result of a suspension of business operations during the Period of Restoration.

118.     The coronavirus caused direct physical loss of and damage to Atma Beauty and other Class members' insured premises, resulting in suspensions of business operations at these premises.  These suspensions have caused Class members to suffer losses of business income.

119.     These suspensions and losses triggered business income coverage under the Policy and other Class members' policies.

120.     Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

121.     Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses.  Accordingly, Defendants are in breach of the Policy and other Class members' policies.

122.     As a result of Defendants' breaches of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable.

WHEREFORE, Plaintiff, individually and on behalf of other Class members, seeks compensatory damages resulting from Defendants' breaches of the Policy and other Class Members' policies and seek all other relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III: DECLARATORY JUDGMENT
### (On behalf of the Extra Expense Coverage Class)

123.    Plaintiff re-adopts and re-alleges paragraphs 1 through 102 above.

124.    Plaintiff brings this Count individually and on behalf of the other members of the Extra Expense Coverage Class.

125.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

126.    Plaintiff's Policy, as well as the policies of other Extra Expense Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

127.    Specifically, Defendants promised to pay for Extra Expenses incurred by Plaintiff and other Class members during the Period of Restoration that the insureds would not have incurred if there had been no loss or damage to the insured premises.  These Extra Expenses include expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

128.    The coronavirus caused direct physical loss of and damage to Atma Beauty and other Class members' insured premises, resulting in suspensions of business operations at these premises.  As a result, Plaintiff and other Class members have incurred Extra Expenses.

129.    These Expenses triggered Extra Expense coverage under the Policy and other Class members' policies.

130.    Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

131.    Defendants, without justification, dispute that the Policy and other Class members' policies provide coverage for these Extra Expenses.

132.    Plaintiff, individually and on behalf of the other members of the Extra Expense Coverage Class, seeks a Declaratory Judgment that its Policy, and those of other members of the Extra Expense Coverage Class, provides coverage for these Extra Expenses.

133.    An actual case or controversy exists regarding Class members' rights and Defendants' obligations under Class members' policies to reimburse Class members for these Extra Expenses. Accordingly, the Declaratory Judgment sought is justiciable.

WHEREFORE, Plaintiff requests that this Court enter a Declaratory Judgment declaring that the Policy and other Class members' policies provide coverage for Class members' Extra Expenses.

## COUNT IV: BREACH OF CONTRACT
### (On behalf of the Extra Expense Coverage Class)

134.    Plaintiff re-adopts and re-alleges paragraphs 1 through 102 above.

135.    Plaintiff brings this Count individually and on behalf of the other members of the Extra Expense Coverage Class.

136.    Plaintiff's Policy, as well as the policies of other Extra Expense Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

137.    Specifically, Defendants promised to pay for Extra Expenses incurred by Plaintiff and other Class members during the Period of Restoration that the insureds would not have incurred if there had been no loss or damage to the insured premises.  These Extra Expenses include

expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

138.    The coronavirus caused direct physical loss of and damage to Atma Beauty and other Class members' insured premises, resulting in suspensions of business operations at these premises.  These suspensions have caused Class members to incur Extra Expenses.

139.    These Expenses triggered Extra Expense coverage under the Policy and other Class members' policies.

140.    Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

141.    Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these Extra Expenses.  Accordingly, Defendants are in breach of the Policy and other Class members' policies.

142.    As a result of Defendants' breaches of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable.

WHEREFORE, Plaintiff, individually and on behalf of other Class members, seeks compensatory damages resulting from Defendants' breaches of the Policy and other Class Members' policies and seek all other relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT V: DECLARATORY JUDGMENT
### (On behalf of the Civil Authority Coverage Class)

143.    Plaintiff re-adopts and re-alleges paragraphs 1 through 102 above.

144.    Plaintiff brings this Count individually and on behalf of the other members of the Civil Authority Coverage Class.

145.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

146.    Plaintiff's Policy, as well as the policies of other Civil Authority Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

147.    In the Policy and other Class members' policies, Defendants promised to pay for losses of business income sustained and extra expenses incurred when, among other things, a Covered Cause of Loss causes damage to property near the insured premises, the civil authority prohibits access to property near the insured premises, and the civil authority action is taken in response to dangerous physical conditions.

148.    Plaintiff and other Class members have suffered losses and incurred expenses as a result of actions of civil authorities that prohibited access to insured premises under the Policy and Class members' policies.

149.    These losses satisfied all requirements to trigger Civil Authority coverage under the Policy and other Class members' policies.

150.    Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

151.    Defendants, without justification, dispute that the Policy provides coverage for these losses.

152.    Plaintiff seeks a Declaratory Judgment that its Policy and other Class members' policies provide coverage for the losses that Class members have sustained and extra expenses they have incurred caused by actions of civil authorities.

153.    An actual case or controversy exists regarding Class members' rights and Defendants' obligations under Class members' policies to reimburse Class members for these losses and extra expenses. Accordingly, the Declaratory Judgment sought is justiciable.

WHEREFORE, Plaintiff, individually and on behalf of other Class members, requests that this Court enter a Declaratory Judgment declaring that the Policy provides Civil Authority coverage for the losses and extra expenses incurred by Plaintiff and the other Class members.

### COUNT VI: BREACH OF CONTRACT
### (On behalf of the Civil Authority Coverage Class)

154.    Plaintiff re-adopts and re-alleges paragraphs 1 through 102 above.

155.    Plaintiff brings this Count individually and on behalf of the other members of the Civil Authority Coverage Class.

156.    Plaintiff's Policy, as well as the policies of other Civil Authority Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses and expenses covered by the Policy.

157.    In the Policy and other Class members' policies, Defendants promised to pay for losses of business income sustained and extra expenses incurred when a Covered Cause of Loss causes damage to property near the insured premises, the civil authority prohibits access to property near the insured premises, and the civil authority action is taken in response to dangerous physical conditions.

158.    Plaintiff and other Class members have suffered losses and incurred expenses as a result of actions of civil authorities that prohibited access to insured premises under the Policy and Class members' policies.

159.    These losses satisfied all requirements to trigger Civil Authority coverage under the Policy and other Class members' policies.

160.    Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

161.    Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses.  Accordingly, Defendants are in breach of the Policy and other Class members' policies.

162.    As a result of Defendants' breaches of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable.

WHEREFORE, Plaintiff seeks compensatory damages resulting from Defendants' breaches of the Policy and other Class members' policies. and seek all other relief deemed appropriate by this Court, including attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, as follows:

A.    Entering an order certifying the proposed nationwide Classes, designating Plaintiff as Class representative, and appointing Plaintiff's undersigned attorneys as Counsel for the classes;

B.    Entering declaratory judgments on Counts I, III, and V in favor of Plaintiff and the members of the Business Income Coverage Class, Civil Authority Coverage Class, and Extra Expense Coverage Class as follows:

i.    Business Income, Civil Authority and Extra Expense losses and expenses incurred and sustained as a result of COVID-19 and related civil authority

actions are insured and covered losses and expenses under Plaintiff's and Class members' policies; and

ii.  Defendants are obligated to pay for the full amount of the Business Income, Civil Authority and Extra Expense losses and expenses sustained and incurred, and to be sustained and incurred, as a result of COVID-19 and related civil authority actions are insured and covered losses and expenses under Plaintiff and Class members' policies;

C.  Entering judgments on counts II, IV, and VI in favor of Plaintiff and the members of the Business Income Coverage Class, Civil Authority Coverage Class, and Extra Expense Coverage Class; and awarding damages for breach of contract in an amount to be determined at trial;

D.  An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

E.  An award of costs and attorneys' fees; and

F.  Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

The undersigned hereby demands a trial by jury as to all issues so triable.

Dated: January 25, 2021                    **PODHURST ORSECK, P.A.**

                                            /s/ Steven C. Marks
                                            Steven C. Marks (Fla. Bar. No. 516414)
                                            Aaron S. Podhurst (Fla. Bar. No. 63606)
                                            Lea P. Bucciero (Fla. Bar. No. 84763)
                                            Matthew P. Weinshall (Fla. Bar. No. 84783)
                                            Kristina M. Infante (Fla. Bar. No. 112557)
                                            Pablo Rojas (Fla. Bar. No. 1022427)
                                            SunTrust International Center
                                            One Southeast 3rd Ave, Suite 2300

Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com
apodhurst@podhurst.com
lbucciero@podhurst.com
mweinshall@podhurst.com
kinfante@podhurst.com

## CERTIFRICATE OF SERVICE

I hereby certify that on January 25, 2021, I electronically filed the foregoing with the clerk

of the Court by using the CM/ECF system, which will send a notice of electronic filing to all

counsel of record and any other electronic filer as of the time of filing.

**PODHURST ORSECK, P.A.**

/s/ Steven C. Marks
Steven C. Marks (Fla. Bar. No. 516414)
Aaron S. Podhurst (Fla. Bar. No. 63606)
Lea P. Bucciero (Fla. Bar. No. 84763)
Matthew P. Weinshall (Fla. Bar. No. 84783)
Kristina M. Infante (Fla. Bar. No. 112557)
Pablo Rojas (Fla. Bar. No. 1022427)

SunTrust International Center
One Southeast 3rd Ave, Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com
apodhurst@podhurst.com
lbucciero@podhurst.com
mweinshall@podhurst.com
kinfante@podhurst.com
projas@podhurst.com